The first case on our docket this morning is 25-10824 Annie M. v. Aledo Independent School District and I don't want to mispronounce your name so I won't try. Thank you. We're ready for you. Good morning. May it please the Court. The issue before this Court is the scope of consent to conduct an initial evaluation of a child with a disability, a little girl with Down syndrome named Annie, so that Annie may receive federally guaranteed special education services. Under the IDEA, the scope of consent is not defined. We posit that what the mores Annie's parents gave was sufficient to constitute consent and that Aledo should have moved forward with the evaluation with that consent. To be clear, Annie's parents fully consent to Annie being evaluated in all areas of suspected disability, including intellectual disability and to cognitive testing generally. Aledo has misrepresented the record on this issue and the District Court's holding is tainted by this misrepresentation. That is exactly what? That Annie or that Annie's parents consented to cognitive testing generally but not to the individual IQ tests at issue. The reason that Annie's parents preferred to proceed with the non-IQ-based cognitive testing is that IQ testing historically has been used to pigeonhole students with disabilities and justify placing the student in a more restrictive environment than would otherwise be allowed. But how Aledo used or planned to use the IQ testing is not at issue today. The IDEA requires informed consent and the mores gave informed consent to the cognitive tests they agreed and Aledo's diagnostician also agreed were appropriate. The ADA also provides additional protection for Annie in that she is a qualified individual with a disability seeking access to public services and was denied reasonable accommodations. Annie's parents want her to be evaluated and receive services. They simply do not want the school to use these IQ tests on their daughter. So this court should reverse the lower court's decision and order Aledo to evaluate Annie without the at-issue tests. And on page 21 of the school district's brief, they say that your family, your client's expert agreed that the DP-4 cannot be used to determine the presence of an intellectual disability. Is that correct? The DP-4 and the DAISY-2 were two of the tests that had been agreed upon by Annie's parents and the diagnostician at the school and they were both found to be sufficient to be used as well as play-based tests. There's a battery of alternate tests that could be used to determine whether Annie had an intellectual disability. So that's a misstatement? Your expert didn't agree to that? I'm not sure if the expert did or didn't agree to the DP-4 specifically but the DP-4 is only one of several tests that had been agreed to previously and because the issue isn't necessarily whether one test is sufficient and that's what the statute also says that there must be a number, a variety of testing tools that are used. And so there were, there were a variety of testing tools that were agreed upon and that that set of testing tools would have been sufficient to find whether Annie had an intellectual disability. And that's also only one area of suspected disability that the school district would have evaluated her under. She could have qualified for a speech impairment or for an other other health condition. So there, this was only one area but there was consent within that area just not to the two IQ tests at issue. So there are other reasons why. Why do you think the statute gives parents the authority to consent to sort of give partial consent as opposed to just consent? Where can I read that in the statute? So your honor, there is nowhere in the statute that defines what consent is. It is, it is left, it is informed consent. There are some indications for example in the regulations. The 34 CFR 300.9 notes that it is an activity for which consent is sought which may provide some indication that there is individual activities that must be consented to. But it really is, it really does come down to what the statute stands for. The statute stands for meaningful parental participation. That's right up front in the purpose. And if you don't have the ability to consent to some part and you're required to take an all or nothing position, that is, that doesn't really fit with the idea that there's a meaningful aspect to parent participation. And that's not just at the IEP stage. That's something that is set forth by Congress in the purpose of the statute and should be read into the consent provision. Here, here the parents, as I understand your argument, did not want to consent to IQ tests because they're worried that the IQ test would be used to pigeonhole their daughter. Yes. I understand. And yet, the evaluator or whoever it is, Williams, seems to be saying when I read the record, look, probably these aren't going to be relevant, but we have to sort of, we can't really know how we're going to fully evaluate this until we see the child and evaluate the child. So we have to, you know, have this sort of, these possibilities. My concern is that the parents who are, have this concern and the evaluator has this sort of broader range of concerns. I just don't understand how we can let this, the parents say, look, I'm going to consent to one, two, three, but not four and five when the evaluator is saying, yeah, but I don't know until I do the evaluation what I'm going to need to do a full assessment of the cognitive abilities. That's my concern. I understand. I think that really plays into the informed portion of consent. There should be an understanding going in to the evaluation about which tests will be conducted. And to the extent that there was any, in, you know, that the evaluator thought that they couldn't perform such the evaluation with the tests that were agreed upon by both parties, there could have been some alternate recourse of, well, if there's no consent to these tests, we can't, we'll have to come back and do some more testing. What if, what if the parents' fears were realized and this IQ test were used in a way that the parents didn't agree with? It strikes me that this is at the beginning of the process. Will the parents have the opportunities throughout this process to say, no, I object to that, I object to this, that this is, you're not evaluating my child in the correct way down the road? Yes, but the test score stays with you. So it's there in your file, whatever they come up and whatever the result of the evaluation is, is documented. So the issue is not simply whether they could at another, down the road, do challenge the services that were provided or suggested by the school. The issue is that now she has an assigned IQ score that has, again, been used in the past as our amicus brief, also the amicus brief details what has been done in the past. It's a historical issue. The concern about pigeonholing, which those are your words, tell me where that would manifest itself in the process. Pigeonholing. It would likely be in the process of placing her in classrooms that were more restricted versus less restricted. So the purpose of the IDEA says that children with disabilities should be educated to the extent, to the maximum extent possible, with their typically developing peers. And there is a pattern and practice in history of, for the reasons that Congress cited, of segregating individuals with disabilities. Oh, well, trust me, I mean, we get lots of IDEA cases. I've written several of them. Where the classroom setting would be, let's say, hypothetically be more would that be part of an IEP? Yes, it would. So the parents could object to that? Yes, they could. And again, our concern, and Annie's parents certainly would not have taken this case as far as they have if they weren't extremely concerned about that testing score. But it's also a situation where the diagnostician did agree with the parents in the first instance. And then when they got the notice of evaluation, those tests were still there. And they, fortunately, or for them, they understood what those tests were. And others maybe don't. But when they did, and they crossed them out, and they said, we'll go forward with all these other cognitive tests, but we don't want to use these two tests to be, you know, to use on our daughter, who also everybody agreed was not, it wouldn't have been able to really perform those tests. They're verbal tests. She was three. She had, as Alito acknowledges, I think 40 to 50 words of vocabulary. The diagnostician noted that she doesn't usually use these tests with itty-bitties. They can't follow the verbal instructions. So this was a situation where it really is almost a pretext for denying her services when they all were on the same page about what the evaluation would consist of. And then it sort of changed. On these facts, the parents provided sufficient consent. And there has to be some middle ground in the consent process where they can, you know, provide, say, look, we all agree on these, but these two, this is not, this is not enough, or this, we don't agree with these two tests. And that's something I was curious about the record. You said their evaluator initially said she's too young. Yeah. I wouldn't use these tests. But then when did she change her, say, no, I don't know if I would use these tests, but I, you know, we can't, we can't test and then go back. It all needs to be, we just have to kind of, it's a string that you play out. It's unclear exactly when that happened, but it was sometime after the, I would say the administration got involved or the process became more formal. It was in the context of a conversation that they had that she had agreed were on the same page about testing. And then when the notice came in, it had the tests listed. And then the mores pushed back on that and moved into the resolution dispute resolution process at that point. So it's unclear exactly when that changed, but there never was a time where she said, we're going to need these tests. And nobody has ever said, we're definitely going to use these tests. They've, they've almost asked to retain the ability to use them without ever committing to using them or without ever committing to them being the right tests for any at the time. So it still is somewhat of a frustration of the process, which really should result in a little girl with Down syndrome receiving self-education services. Counsel, the statute and the CFR obviously say nothing about what the nature of the consent is, says informed consent, but does not define that. Has your research in this case illustrated the way other school districts approach this topic? Have you ever seen another case where the school district says, we need you to consent to the following 30 things, including ones that we tell you we're not going to use, but you have to consent to them now, or we won't do anything. I would say that in the case law that has been presented, which all occurs more at the services stage, we don't have a lot in this evaluation stage. It's very, it's very limited, but there is always a back and forth. And that, that I've seen many times in, in special education, that there's a back and forth between the school district and the parent. That's the way the statute envisions it. And that's typically how it plays out. Sometimes the school will offer certain tests. The parents will come back and say, no, we, we really don't want those two in the school. We'll say, okay, I think we can proceed with that. Sometimes they have an advocate involved. Sometimes the parents simply agree to everything. There's a lot of ways in which it does play out in the day-to-day situations that never frankly get to this level. It's, it's mostly done and agreed to and negotiated. And the parents are a part of that process. As far as my experience goes, and in the, and in the case law. So even in some of the cases that Alito cited, it's, it's cases where the parents, they went back, there was some back and forth, and ultimately there were just so many restrictions imposed that the school didn't know how to go forward with the testing, testing given those restrictions, or they didn't, they didn't know how to proceed with services or re-evaluation. A lot of them are in the re-evaluation context. So there's already been services established and they're just going back and doing testing, but that is very common that there's just a back and forth between the parties. If we were to affirm here, would we be the first court that you're aware of to say that a school district can deny IDEA coverage entirely if you don't agree on the front end to a host of tests, including tests that the school district says it does not need? As far as I'm aware, yes. Can I ask a quick question about the ADA before I realize your time is, I'm sorry. What was the nature of the injunction that you requested? So what we would like under the ADA is for, it's, it's basically that she's been denied access to these services. And so what we would ask is that she be allowed to proceed with the evaluation without the tests that would, that are not going to accommodate her disability, which is what we say. Those tests are the, the testing, it's sort of blocking her access to those, to those services. And so if they were to go ahead and not, not do the tests, which would be a reasonable accommodation under the ADA. And then again, if it, if they were needed, they could come back and say, we really need these tests. They're not, it's not working without them, but the accommodation never happened. So again, the injunction would be to move forward with the testing without those two tests and, you know, put the burden on the school district to show that those tests are needed and basically accommodate her disability that way. I had a question about her disability real quick. She was receiving some services already as an infant for what, three years? Yes. Under the... Wasn't she disabled within the meaning of that program? Yes. So she's already been declared to have a disability. Correct. Under, for, she has a record of disability under the ADA. It's really, it's the IDEA where her disability hasn't been established statutorily. Obviously she has a disability, but she's under the, under the ADA, it's the record of disability from, from her early intervention services. What, so when we get these IDEA cases, they pass through many layers of review. Here we have a hearing officer, we have a district court. What are you asking us to reverse? So what would be the standard of review for the thing you're asking us to reverse? We're asking to reverse on the legal error. What legal error is that? Of finding that there was no consent under the statute, that there should be a consent, that this should operate as consent under the IDEA. That's the, that's the request and the review would be de novo. As to whether these tests are required or not, there's a lot of back and forth. Is that a fact question? And are we bound by what the district court found or what? I think the, the factual issue of whether the tests are required is not before the court, so to speak. If it were the court's, if the court were to reverse that. Well, I mean, it seems like it's, there's a, that's part of the consent piece. The district court said, well, these tests are needed and factually I find that they are needed. At least the ability to give them if, if needed is there. It has to be at the same time. Is that a factual matter that we're bound by or what's the standard of review there? I'm not sure. Well, this, I, the standard of review for factual error, for facts is clear error, but I don't think that the district court found that the tests are needed. I think the district court found that the, the, um, hearings officer, the hearing officer's, um, order was correct in that they could proceed on the basis of that, the partial, or sorry, the, um, the school district was allowed to proceed over the parent's refusal of the tests. That was the, the lower courts or the administrator. I believe my time is out. I beg for rebuttal and I will come back for that. Thank you very much for your time. Good morning. My name is Meredith Walker and I'm here on behalf of Aledo ISD. The district court correctly found that the M family did not provide consent under the IDEA for a full and individual evaluation for an FIE and in turn found that the school district did not violate the IDEA or the ADA. And Judge Richman, I want to start with your first question with respect to the DP-4. We asked their expert during the underlying due process hearing, can you use the DP-4 to determine if a student has an intellectual disability? And on the record of appeal at 1475, their expert said no. Are there limits to what the school district can demand in the consent? So all that the consent, when you look at the, at 300.9, it just says that we have to ask for informed consent. So that requires us to explain what it is that we are going to be evaluating for. And then from there, the IDEA, actually, when you at the implementing regulations under 300.304, that is the one place in the IDEA where it specifically puts the burden on the public agency and the public agency is defined as the state or the local educational agency. Let me rephrase. Are there limits to the things that the school district can put into that informed consent? No, there are no limits. So what if the school said, we would like you to consent to us testing your daughter using phrenology? So obviously, junk science, everyone agrees it's junk science. Could the school district demand that you consent to phrenology? So no, because we have to use technically sound instruments that assess the relative contribution of cognitive and behavioral factors. They have to be administered by trained and knowledgeable professionals. So the answer to the question is yes, there are limits. Yes, and that's under 300.304. Perfect. So now we're on the same page. There are limits. Now, your instructor, Ms. Williams, your trained professional said, and God bless the Morley's for recording it, so we don't have to wonder what was said. But she said over and over and over on two separate occasions, I'm not doing the tests. I'm not testing. I'm not using Wexler. I'm not using Woodcock. I wouldn't give Woodcock to itty bitties unless I had the ECAD. If there's language delays, it's not going to work anyway. Over and over and over, she says not going to use it. So why would informed consent require the parents to agree to a test that the administrator says she's not going to administer? So when you look at 1161 on the record, which is where the informed consent page is, it specifically says right in there, and I want to pull it up, there were two consents. And when you look at the first one, it specifically says that examples of such assessment techniques include the Wexler Intelligence Skills, the Woodcock-Johnson, and the Vineland Adaptive Behavior Skills. After that consent was sent, there was a telephone conversation that was recorded on October 11th. And in there, the diagnostician specifically said, yes, those tests are not appropriate. Those are pre-populated. We can't change those. They then sent a second consent. And on that second consent on page, I believe it's 1164 of the, yes, it's 1164 of the record on appeal. And it then went common assessments for the age group may include, and it listed those common assessments. So when you listen to that recording as a whole, she was not saying that the assessments that were on the second consent were inappropriate assessments. She was explaining that the example assessments included in the first one are not ones that she would use and are not ones that are appropriate. But that's a form that's given to all individuals. And it doesn't say that those are the tests that are going to be used. It just simply says those are examples. But it's not informed consent if you don't intend to administer the test. Like you can't say it's informed consent. In order to agree, in order to have idea testing in Aledo, you have to agree to all of the risks associated with an appendectomy. Now we don't, we're obviously not going to give your daughter an appendectomy, but like whatever, that's part of the informed consent. It's a form that no one in their right mind would think that informed consent requires you to agree to something that we tell you we're not going to do. Except for, you're correct, but again, those are, those state that those are examples. And it clearly says those are examples on the, on the consent form. It does not say we are using these. It says examples of tests. But that hurts you doesn't help you. That's what I'm trying to really get. I'm trying to understand the school district's perspective here. Like there are so many contradictions in your litigation position that it's difficult to count them all. But you say, look, on the one hand, consent to this, even though we're not going to do it. Two, if you do consent to it, you can revoke it later. Three, we're going to go to a SOA ALJ and we're going to get an order that says we can test over your objections, which I guess apparently now after you get the ALJ holding, right, you don't need their consent at all. You can just forcibly administer IQ tests to this little girl if you wanted to. So what happens to all of the representations in the record where you say, well, you can obviously revoke and none of this is done against your will anyway. So like all of these are contradictions and why in the world would it be iterative and cooperative if they have to agree on the front end to a battery of tests that your own person says she's not going to administer? Like that's at least four different contradictions in just your litigation position over just the consent question. Because the IDEA ultimately puts it on the school district. The school district is responsible for choosing the test and there's plenty of evidence in the record on appeal before the court that specifically says we can't know what tests we're going to use. So for a school district to have to lay out every single test that it could possibly use, it's not possible. But you would do the consent iteratively. Like the process is iterative and it's cooperative. So this is what all of the, including from Margaret, I'm forgetting her surname, but the administrator lady in the third reported meeting. She says, look, each time we do a thing, you're part of it. You're present. You can see it. So what is the, why in the world would the consent not be done iteratively if the testing is done iteratively? Because there's actually a case, there was a hearing officer's decision against Dallas ISD where they ran into this exact position. To allow it to be done that way runs headlong into the Michael F. Factors, which this court looks at when we have to develop an IEP. Judge Duncan, you issued the opinion on Lawrence C, which is the seminal case in this circuit that says we have to evaluate to determine what a student's needs are because those needs are what we focus an IEP on. And so- But no one's disputing that. But in the Dallas case, they only got a partial consent. And halfway through, they realized that they needed additional consent to test for autism because they then had a consent. The parents then refused to provide that consent. And so Dallas couldn't move forward and develop an IEP. So if I was standing here in front of you and said, well, we only did a partial consent. We only did a partial FIE because that's all the parent would do. And now we have an IEP that's not appropriate and it doesn't meet the Michael F. Factors. This court's not going to excuse the district from providing a student with a faith because there's cases where we can't place that burden onto the parents. It's the school district's responsibility to provide a student with a faith. I still don't understand the response. So suppose the Morley's had signed it the way you wanted it, right? They sign the thing, they go, they do the play-based thing. And then Ms. Williams, notwithstanding the multiple times she says she's not going to do it, she decides she wants to do an IQ test on a girl who has 40 to 50 words and is only five years old and has Down syndrome. So she wants to do an IQ test and the Morley's say no. They're allowed to say no, right? Yes. And then the district wouldn't have the information that was necessary to develop. But Michael F. says nothing about that, right? If the Morley's say no at the end, that's why I don't understand why you have to have it at the front. The first Michael F. Factor, that's exactly what it says. The first Michael F. Factor requires school districts to develop an IEP that's based on assessment and performance. So if we're not able to fully assess the student, we are not going to be able to develop an IEP based on assessment and performance. And again, the needs of a student are the most important when we're looking at an IEP and we base that off of an assessment. So if we don't have an assessment that fully evaluates what a student's needs are and fully evaluates within the evaluator's professional judgment, and everybody agrees that the evaluator should be able to use their professional judgment to decide what evaluation tools are used. Because if we did it in the way you're describing, what would happen is an evaluation is like a puzzle. So an evaluator who is trained professional, who has a certificate from the state of Texas, goes and they look at the student and they say, okay, we're going to try this test. Maybe the student doesn't cooperate, or maybe that test isn't going to be appropriate for the student. So they need to pivot. So they need to look at this. It is a- Okay, is there any evidence that an expert would say, yes, there might be a circumstance I would use either of these tests on this three-year-old at the time all this was happening, getting her verbal abilities and where she was that any expert testimony said, yes, we would need to do one or both of these tests at that point. So there's not because the evidence before you says until we get the student in front of us and until we see how the student is performing, we can't make a determination as to what evaluations we are going to use with the students. Would that include this individual? Because initially your own evaluator said, I would never use these tests on her, correct? She said that. She said that she would never use the examples listed in the first consent on- And how are those different than the examples in the second? The second consent sets out the evaluations that are appropriate for three to five-year-olds in a separate section. The evaluation- Can you give me a record site we're talking about the same thing? Yes, it's on 1161. So if you look at 1161 on one, two, three, four, five down on the chart, it says cognitive intellectual adaptive behavior and it says examples of such assessment techniques include Wessler, Woodcock, Johnson, Vineland. When the conversation was had and the diagnostician said, I would never issue those, she was referring to those example tests. When you go to page 1164 of the record on appeal and you go down to the other factors relevant to this evaluation, it says when assessing the cognition of students who are three to five years of age, it's important to use a combination of formal and informal assessment methods to gain a comprehensive understanding of their cognitive abilities. Common assessments for this age group may include observations, parent and teacher interviews, transdisciplinary play-based, and then we've got the DAYC2, the DP4, the ECAD, and the WPPSI, the preschool version, not the example that was given at the top. But it's just not what she says. She says she's not going to apply Woodcock, the WPPI, whatever, that's the Woodcock one, right? No, well- Or is that the Wessler one? I can never remember. So that's Wessler. Thank you. There's also, there's different Woodcock-Johnson. So if you look, the Woodcock-Johnson that's at the top is, this is a Woodcock-Johnson for test of early childhood and academic development. And she actually said, I wouldn't do the Woodcock unless I also did the ECAD. And the ECAD is one that she could be providing. But the parents agreed to ECAD. No, the parents didn't agree to- ECAD is an acute test? And that's where the confusion comes in. Did the parents agree to ECAD? No, because they marked out the examples. So does that mean that we can only go with what's in the examples? Or does that mean we can test on everything except for what they put in? We don't know. That's why we need full consent. That's not marked out. That's not- Counsel, I have just one question. The concern that I'm hearing from the parents and their counsel is that an IQ test will be used that's inappropriate for the child. That will then be used in an IEP to pigeonhole the child or to put the child in an educational setting that is too restrictive. If that, in fact, happened, could the parents object during the IDEA process? Absolutely. As you know, Judge Duncan, there is a process to go and file a due process hearing and object to the placement for a student. And one of the Michael F. factors that this court applies is whether it's the least restrictive environment for a child. There are procedural safeguards in the IDEA that provide for that. So there are multiple steps that a parent can take to address a placement issue if they disagreed with where a student was placed. Oh, I forgot. I have another question. Did the hearing officer in this case make any findings with respect to any testing, IQ testing, all the acronyms that we're throwing around as if we know what they are? Did the hearing officer make any findings with respect to that? So the hearing officer found that the testing was appropriate and that they gave the district the ability to conduct whatever evaluation it felt like it needed to conduct to address the student's disabilities or suspected disabilities, I should say. And then it found that it wasn't full consent. It was only partial consent, which is not consent. Under the CFRs, what are the parents supposed to consent to? So when you look at all of the, all it says under 34 CFR, let me get there. When it talks about consent, it's really, it becomes a statutory construction question. So consent's under 300.9, and it just says that the parent has been fully informed of all information relevant to the activity. Well, what is the activity? That's my question. The activity is the evaluation, and the evaluation, it's defined at 34 CFR 300.15, and it says it's the procedures used, procedures, multiple, plural, in accordance with 300.304 through 300.311, and Judge Oldman, that's all of those provisions that I was talking about earlier about making sure that it's, you know, given by a trained and professional that the public agency picks the right evaluations, all of those things, and to determine whether a child has a disability. Well, I mean, does activity refer to each particular test that could be used? No, because activity would refer to evaluation, and evaluation talks about the procedures. And then because when you go to the statutory construction argument, as you know, we can't read words into statutes that don't otherwise exist. The statute is silent on whether it's full consent, partial consent. That appears nowhere in the IDEA, and so we have to make sure that we're not rendering other parts of the statute inoperative, superfluous, and void, insignificant, and to read into any of those definitions that partial consent is full consent under the IDEA renders other portions of it, of the IDEA or its implementing regulations inoperative. It basically means that they're meaningless, because if we have to evaluate for all suspected areas of disability, but a parent is able to come in and say, well, I only want these tests but not others, then that takes the public agency away from the one deciding what evaluation measures it's going to use, which again is what the IDEA tells them that it's supposed to do. Because when you're looking at 300.304, it specifically and repeatedly talks about it's the public agency. And then even under 300.300 of the implementing regulations specifically notes that states can add in additional consent requirements, but even then it has to make sure that those additional consent requirements don't prevent a student from having or receiving a FAPE. And the district would posit to the court that by allowing this partial consent, again, we run headlong into the Michael F. Factors. Counsel, is there another, can you cite a case where a court, I'd take an IDEA case would be great, but it could be really honestly any case, where a court says that informed consent means that you're consenting to things that we intend not to do. No, I can't actually direct you to any court cases on that issue because, as was already discussed with counsel, this is really an issue of first impression. And there have been, where I was going is there have been some states that have added additional consent requirements. And counsel in their brief pointed out one, that New Hampshire does provide for partial consent, which tells you that the IDEA does not because New Hampshire added in that extra provision. And the Texas legislature has added in extra provisions to the Texas Administrative Code. They know how to do it. And Texas, we have extra requirements for FIE timelines. We have extra requirements for letting parents know whether we're going to hold an ARD committee. We have to respond within five days with a prior written notice or convene an ARD committee. We have extra requirements regarding reconvening, providing parents with a 10-day recess if there's a disagreement with an ARD so they can come back where we consider additional information. The Texas legislature knows how to add in extra IDEA requirements. Before we run out of time, I just want to make sure we've touched on the ADA very quickly. Does every student who enrolls in Aledo ISD have to sign these consents and take IQ tests? No, you only have to do that if you are seeking services under the IDEA to get consent, or if you are seeking services under Section 504. Section 504 also has an evaluation process. It's not as robust under the regulations as the IDEA process is. But even for Section 504, if you want your student to receive services as a student with a disability who has a substantial or has impairment at substantially one of the major life activity, under either of those you have to give consent for an evaluation. The committee has to meet, there has to be an eligibility determination under both, and then the committee has to decide whether it's the 504 or the IDEA committee. So the reason that the school district required these tests and these consents here is because this little girl has Down syndrome and at the age of three had a vocabulary of 40 to 50 words. Well, they required it because the parents requested testing and they suspected that the student has a disability. Is there a dispute in the record about whether she has Down syndrome? No, there's no dispute in the record that she has Down syndrome. Is there a dispute in the record of whether that is an impairment of a major life activity under the ADA? So just because you have an impairment, I mean under Health versus King, it says just because you have an impairment doesn't mean you have a disability. We suspect that she does. Do you have any record evidence? I mean, this summary judgment I'm asking, is there a factual dispute about whether she has a disability that impairs a major life activity? Yes, because... Oh, there is. Tell me. Well, she has Down syndrome, which is a genetic condition, and we have no doubt that she has a disability, which is why we are trying to evaluate her. But up until this point, we have not been able to sit down and evaluate her to see what, does she have an intellectual disability? So your position is that if you don't evaluate her, you can't tell if she has an ADA disability? So... And what case in the United States has ever held that? So for purposes of IDEA, yes, we have to evaluate her. Nope, I'm asking about the ADA. No, so for the ADA, no, I can't give you that case. But with respect to the ADA, I have four seconds. Can I finish? I'm going to ask a question, and you can have time to answer my question. Thank you, Judge Hopkins. The ADA also requires that what happened be because of the disability. Yes. And what is the district's position about... I mean, in other words, the unfavorable treatment, I guess, I don't know what the language is, was because of the disability. You just told us that she has a disability, I agree. But why was she not given IDEA evaluations? Was it because of the disability, or was it because of something else? It was because her parents didn't provide full consent to the district, so we could, or so OLEO ISD could evaluate. I see. But I'm sort of at a disconnect here. She's got a disability, nobody can deny that. And where under the ADA, it says you don't have to do anything until you get the test you want. So they're saying that we failed to accommodate her by removing tests from the IDEA evaluation. That would be an accommodation. So going with she has a disability, we don't know the consequential limitations of that disability until we evaluate her. And removing tests from a... Do you have to have an IQ test to determine under the ADA what her disability is? No. Okay, then why are we not in violation of the ADA? Because the accommodation, they've said that we failed to accommodate her under the ADA. You're not letting her in school. But that's because her parents, she can enroll in school. She can enroll in school and go to school. They're wanting services. She needs accommodation because she's got a disability. And you said you don't have to have an IQ test to figure out that she's got a disability. Why can't they put her in school and you start accommodating her disability without the IQ test? Because it's not needed. Because you have to know the consequential limitations of the student's disability. Whether we need an IQ test to determine she has an ADA disability and whether we're able to accommodate her under the IDEA are two different issues. That's right, and not just the ADA. But even under the ADA, we still have to know the consequential limitations of her disability. And so we still have to know what her cognitive function is, whether that's getting an IQ test or figuring out... They say they have consented to cognitive tests. Is that not true? We don't have consent. The only consent we have, they've marked out the evaluations that the district wants to provide. But you told Judge Richman that you don't need the IQ test to figure out if she's disabled under the ADA. We're not talking about IDEA anymore. We're just talking about the ADA. You told her, you said to the court, you don't need the IQ test to do that. It's all obviously consented to that she has a disability. You have to accommodate. And the only accommodation you offered was, sign my form or kick rocks. Right, because under the IDEA, in order to... You didn't actually tell her to kick rocks, did you? Yeah, no, we didn't, Judge Duncan. And you can't separate them out. U.S. Supreme Court says you have to. To separate out the IDEA and the ADA? Yes. So, the IDEA, the ADA, and Section 504, when it comes to a student receiving a FAPE, all operate under the same framework. This court has held in Williams v. Louisville that if you are providing a student with a FAPE under the IDEA, that's going to meet your requirements under Section 504. But you're not doing that, but you still have an ADA requirement. Correct, but what they want us to do is remove test so we can't figure out... They want you to remove IQ tests. They said they've agreed to other cognitive tests, and can't you start educating this child without IQ tests? Yes or no? No, because we wouldn't be able to do a full evaluation under the IDEA. What expert has said that you can't accommodate her under the ADA without IQ tests? As I stated earlier, the experts all testified that you can't know what tests you are going to need to provide to a student until you get in there... For ADA purposes? So, students are accommodated under the ADA for things such as needing wheelchair assistance, needing to access elevators, it all falls under Section 504. In order to provide specially designed instruction, that's not what the ADA requires. Specially designed instruction to accommodate a student who has disabilities that impair her major life activity of education or learning goes through the IDEA. Again, to accommodate her under the ADA and testing her under the IDEA, we still have to know the consequential limitations, and I still go back to removing tests that we don't know whether we're going to need or not until we evaluate her is not an accommodation under the ADA. The accommodation under the ADA that is being requested here? The accommodation. They want to dictate what tests the district gives to determine whether she has a disability under the IDEA. They want us to remove tests. So, you're telling me the accommodation that is requested is IDEA evaluation absent the tests they don't want to consent to? Yes, Judge Duncan. That is correct. Any other questions? Thank you for the additional time. I appreciate it.  I don't want to take up too much more time. I just want to wrap up with a few thoughts. What are we doing here? This is a child with Down syndrome who should be receiving special education services and hasn't for three years. I mean, with all due respect, we have a statute that is very complex that has multiple layers of evaluation. These cases are always difficult. They always have difficult facts. But the question is, what does the law require and what is our role in evaluating what the hearing officer in the district court did? It's not enough, with all due respect, to say this child has Down syndrome. I'm very sorry about that. But the question is, has the statute been complied with? And I would argue that the statute has not been complied with, that there has been consent given to all areas of suspected disability being evaluated and to only limiting in one very specific way the test that the diagnostician agreed would all not be the appropriate test to provide this child. There is no reason why the school district couldn't have moved forward with this evaluation. The reason that this is, I don't know, I didn't hear opposing counsel give a reason to this court of why they didn't just go ahead and agree to the cognitive test that everybody was on the same page about and evaluate the child and move forward with their services. I simply didn't hear that. They consented to the area. The idea that the professional's judgment on the spot is what this is all about. Well, then how is informed consent being met? If there's not an information given of what the tests are that are going to be used going in, how is that informed consent? That's what the statute requires. To move to the ADA, which we got to at the very end, what is the accommodation under the ADA that you are requesting? We are requesting that the IQ tests, which she was not going to be able to perform according also to the diagnostician, not be used during her evaluation process. So the accommodation, I mean, I think you just said what opposing counsel said, which is the accommodation you're asking for is for an IDEA evaluation absent the tests that your clients will not consent to. Is that correct? That is correct. Okay, so the two are related. In a sense, but the services that we are trying to access, which is the public education services, the provision of those services is an independent right, and the Supreme Court has recently affirmed that in the AJT case. These are independent claims, and to us, it's a- I just don't understand the meaning of that statement when you just told us, and the other side just told us too. The accommodation that's being requested, is the IDEA evaluation absent the test that you don't want to consent? It is accommodating her disability by not administering tests that would not be able to be performed by her with her disability under the ADA. Okay. Thank you, Your Honors.